*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 14, 2025

**By ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Christopher Santos*, 22 Cr. 522 (GHW)

Dear Judge Woods:

    The Government respectfully submits this letter in advance of sentencing in the above captioned case, which is scheduled for January 21, 2025. Christopher Santos, a/k/a "Casper," has pleaded guilty to a violation of Title 18, United States Code, Section 924(c), in connection with his use, carrying, and possession of a firearm in connection with a narcotics trafficking offense.

    As described more below, the defendant was a street-level dealer who sold narcotics with the 174th Street Crew and, in connection with which, carried a firearm. Based on the defendant's involvement with the Crew as an armed street dealer, the Court should sentence the defendant to a sixty-month term of imprisonment, the mandatory term of imprisonment required by statute. This sentence would be fair and just, and it would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

    **I.**    **Factual Background**

    **A.**  **Participation in the 174th Street Crew**

    Since at least in or about 2019 in the Washington Heights section of Manhattan, a drug trafficking operation (the "174th Street Crew," or the "Crew") has been engaged in prolific narcotics trafficking. The Crew operated principally in Washington Heights between West 174th and West 175th Streets and Amsterdam and Audubon Avenues (the "Set"). Within the Set, the Crew conducted narcotics trafficking on the street and from multiple storefronts. The Crew also operated stash houses from apartments on West 174th Street.

    The Crew ran an organized and sophisticated narcotics trafficking operation that is best described as a street pharmacy. The Crew sold a variety of narcotics, both illicit and prescription, to its customers, including methamphetamine (which was marketed as ecstasy), cocaine, heroin, crack cocaine, fentanyl, oxycodone, Xanax, and marijuana. The Crew operated on the Set at all

hours, and its members were assigned to work in designated shifts. Managers ensured that the Set was properly staffed for narcotics distribution and well supplied.

Between February and December 2022, the NYPD conducted approximately two dozen undercover purchases of narcotics from the 174th Street Crew. Collectively during these transactions, the Crew sold the NYPD undercover officers more than 575 grams of methamphetamine, approximately 45 grams of oxycodone, and approximately four grams of cocaine. Prior undercover purchases from the Crew, in and about 2020, had resulted in additional seizures of fentanyl-laced heroin, oxycodone, and Xanax. Recordings from these undercover buys show eight of the charged defendants, including Santos, selling directly to the undercover officers. In addition to undercover purchases, the NYPD has seized large quantities of additional narcotics from the Crew.

Christopher Santos was a member of the 174th Street Crew who was principally responsible for selling narcotics in and around the intersection of West 174th Street and Amsterdam Avenue. Santos—known principally by his nickname "Casper"—was a street level dealer who took direction from more senior members of the Crew, including Ray Eduardo and Alexander Francisco. In text messages recovered from Eduardo's phone, there were multiple messages exchanged between Eduardo and Crew leader Alexander Francisco where Francisco directed Eduardo to resupply Santos. For example, on February 28, 2022, Francisco asked Eduardo "How many 20's [20mg oxycodone tablets] u gave Casper," to which Eduardo responded "13." In a message sent on March 9, 2022, Francisco instructed Eduardo to "Giv 21 greens [15mg oxycodone tablets] to Casper." That is, Santos appears to have been a street dealer junior to Eduardo, who was providing him (Santos) with resupply at Francisco's direction.

On two occasions, Santos sold narcotics to an undercover ("UC") NYPD officer. First, on or about July 19, 2022, Santos sold a UC 1.394 grams of Oxycodone. Second, on August 9, 2022, Santos sold a UC four pills containing methamphetamine and three Oxycodone tablets. In addition, just after midnight on August 31, 2022, Santos was arrested while conducting hand-to-hand transactions and was found in possession of a firearm. As described at the trial of Santos's co-defendant Alvin Eusebio, on August 30, 2022, NYPD officers were conducting surveillance in the vicinity of W. 174th Street and Amsterdam Avenue in advance of a controlled purchase of narcotics from Santos's co-defendant Jeriel Abreu. (Tr. T. at 250). [1] While conducting surveillance, the NYPD officers observed, as depicted below, Santos conducting hand-to-hand transactions with Francisco, while standing outside of Legendary Juice Bar and SK174 at the heart of the Crew's territory. (*Id.*) Shortly after observing Santos and Francisco, the NYPD officers saw Abreu walk away from the storefronts and walk approximately one block where he sold a UC 301 methamphetamine pills. (*Id.* at 254-55).

---

[1] "GX" refers to Government exhibits introduced during *United States v. Alvin Eusebio*, 22 Cr 522 (GHW). "Tr. T." refers to the trial transcript from the same.



      Hours later, at approximately 12:15 AM on or about August 31, 2022, three NYPD officers arrived near the intersection of W. 174th Street and Amsterdam Avenue where they observed a group of individuals gathered in front on SK174, in approximately the same location that other officers had earlier observed Santos and Francisco. (Tr. T. at 516-17). The group included, among others, Santos's co-defendant Juan Checo, who was providing oversight of the Crew's activities that night. One of the officers (the "Officer") approached Santos and, after a brief conversation, felt the bag that Santos was wearing across his body. Santos agreed to open the bag which the Officer found to contain, among other things, (i) a loaded Glock 42, .380 caliber firearm with four rounds; (ii) 172 Oxycodone pills; (iii) 6 Xanax pills; (iv) 36 methamphetamine tablets; and (v) approximately $1,702.50. (*Id.* at 519-20).

 

*(L) Firearm recovery from Santos's bag as captured on bodyworn camera; and (R) the recovered firearm*

## II. Relative Culpability

In an effort to capture the relative culpability of the defendants in the case, the Government has arranged the defendants into three groups—each group including similarly situated defendants. Within each group, the defendants are further arranged in generally descending order of their roles within the scheme. Where applicable, the tables below reflect these groups and the Guidelines calculation applicable to each defendant pursuant to their respective plea agreements with the Government. The Government will update these tables in future sentencing submissions to reflect the sentences imposed.[2] As shown below, the defendant is positioned at the bottom of Group Three.

### Group 1 (Leaders, Organizers, Managers, and Supervisors)

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Aristides Ramirez | S6; (b)(1)(A) + 924(c) | 43 | III | Life plus ten years | 240 mo | |
| Alexander Francisco | S6; (b)(1)(A) + 924(c) | 43 | IV | Life plus five years | 180 mo | |
| Alvin Eusebio | S6; (b)(1)(A) + 924(c) | 43 | II | Life plus twenty-five years | 420 mo | |
| Juan Checo | S5; (b)(1)(B) | 34 | III | 188-235 mo | 60 mo | |

### Group 2 (Senior Members of the Conspiracy)

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Osiris Suarez | S4; (b)(1)(B) | 31 | I | 108-135 mo | 60 mo | 90 mo |
| Alex Garcia | S1; (b)(1)(B) | 31 | I | 108-135 mo | 60 mo | 90 mo |
| Reginald McClure | S5; (b)(1)(B) + 924(c) | 31 | VI | 262-327 mo | 120 mo | 322 mo |
| Aneudy Alvarado | S6; (b)(1)(B) | 33 | III | 168-210 mo | 60 mo | 132 mo |
| Lazareth Paulino | S6; (b)(1)(B) | 35 | I | 168-210 mo | 60 mo | |
| Jonathan Rodriguez | S1; (b)(1)(B) | 33 | I | 135-168 mo | 60 mo | |
| Jose Pichardo | S5; (b)(1)(B) | 29* | I | 87-108 mo | 60 mo | |
| Eric Eusebio | S3; (b)(1)(B) | 33 | I | 135-168 mo. | 60 mo | 72 mo |
| David Glover | S1; (b)(1)(C) | 29* | I | 87-108 mo. | n/a | |

---

[2] Because defendant Eddy Caminero pleaded guilty to witness tampering charges, he has been excluded from the below relative culpability analysis.

**Group 3 (Long-term Drug Dealers)**

| Defendant | Counts of Conviction | Offense Level | Criminal History Category | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Jeriel Abreu | S1; (b)(1)(B) | 29* | I | 87-108 mo | 60 mo | 78 mo |
| Ray Eduardo | S1; (b)(1)(C) | 29* | I | 87-108 mo | n/a | 60 mo |
| Enmanuel Liriano | S1; (b)(1)(C) | 29* | I | 87-108 mo | n/a | 60 mo |
| Joan Mercedes | S1; (b)(1)(C) | 29* | I | 87-108 mo | n/a | |
| Luiyi Santana[3] | (b)(1)(C) | 31 | I | 108-135 mo | n/a | 42 mo |
| Jawan Mills | S1; (b)(1)(C) | 31 | V | 168-210 mo | n/a | |
| Christopher Espinal | S4; (b)(1)(C) | 35 | I | 168-210 mo | n/a | 90 mo |
| Christopher Santos | S1; 924(c) | n/a | I | 60 mo | 60 mo | |

*Applied a two-level reduction pursuant to U.S.S.G. § 4C1.1(a).

### III. The Plea, Guidelines Calculation, and Criminal History

On September 18, 2024, the defendant pleaded guilty to a violation of 18 U.S.C. § 924(c), as charged in Count 2 of S1 22 Cr. 522 (GHW). In the plea agreement, the parties stipulated the Guidelines sentence is the sentence set forth in the statute: 60 months imprisonment (the "Guidelines Sentence"). Pursuant to U.S.S.G. § 2K2.4, this Guideline sentence is calculated without reference to the defendant's criminal history. The Probation Department agrees. (PSR ¶¶ 78-79).

This offense represents the defendant's second criminal conviction. The defendant was previously convicted in New York County Supreme Court of Criminal Possession of a Weapon in the Fourth Degree, and sentenced to time served. As described in the PSR, the defendant's previous conviction stems from his possession of a firearm on April 2, 2021. On that date, the defendant was arrested on an open warrant. During the arrest, law enforcement observed a firearm fall from the building in which the defendant was located. The NYPD recovered the firearm and obtained a DNA profile, which matched the defendant's DNA profile. (PSR ¶ 81).

### IV. Discussion

#### A. The Section 3553(a) Factors Support a 60-Month Sentence of Imprisonment

The Government respectfully submits that the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weigh in favor of a sentence of 60 months' imprisonment. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to afford adequate deterrence to this defendant and others, and to protect the public from the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

---

[3] Luiyi Santana, who was admitted to and later discharged from the Young Adult Opportunity Program, without successfully completing the program, was charged in case 24 Cr. 444 (RA).

The defendant is a street-level member of the Crew who was involved in two sales to law enforcement and was arrested while conducting hand-to-hand transactions, while in possession of distribution quantities of narcotics and a firearm. He was involved with selling drugs with this organization from at least February 2022, when he made his first sale to an undercover detective, until the arrest that led to his indictment in this case, in August 2022. The Crew with which the defendant was personally involved made tens of thousands of sales of addictive and destructive narcotics to users and addicts from across the city and region. This conduct leads to devastating illness, destabilizes communities, and funds vicious criminal organizations. And for this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000).

As revealed by his sales to undercover officers and his arrest while in possession of distribution quantity narcotics, the defendant personally sold at least Oxycodone, methamphetamine, and Xanax. According to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[4] The crisis has only worsened. In 2023, for the first time in U.S. history, the overdose death rate topped 112,000 in a 12-month period, according to the Center for Disease Control and Prevention, with young people and people of color among the hardest hit.[5] Drug policy experts and people living with addiction say the magnitude of this calamity now eclipses every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[6]

The Crew and the defendant engaged in such dangerous, sustained, long-term, drug trafficking for a simple reason: money. The defendant and other members of the Crew put members of the community at risk, feeding the cycle of addition, desperation, and death, for little more than personal profit. The defendant's conduct was selfish, dangerous, and deserving of a significant term of incarceration.

There is no doubt that the defendant's crime was serious. On the day of his arrest, the defendant had been standing on a sidewalk in Washington Heights for hours, selling highly addictive drugs while carrying a loaded firearm. All day long, New Yorkers attempted to safely

---

[4] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text=Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can "wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[5] https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction#:~:text=In%202023%20the%20overdose%20death,for%20Disease%20Control%20and%20Prevention.

[6] *Id.*

live their lives, driving and walking along W. 174th Street, completely oblivious to the fact the defendant was standing by with both deadly drugs and a deadly weapon strapped to his chest. By definition, his crime involves both the dangers of selling narcotics and possessing firearms, the combination of which presents an enormous threat to public safety and the well-being of the community.

While the defendant's criminal history category is irrelevant to the calculation of the Guidelines range for his crime of conviction, *see* U.S.S.G. § 2K2.4(b), it is relevant to the Court's analysis of the need for specific deterrence under § 3553(a). As detailed above, the PSR identifies a previous conviction for gun possession.(PSR ¶ 81). When combined with the defendant's non-compliance during his term of supervised release,[7] his criminal history makes clear that there is a substantial risk of recidivism and need for specific deterrence. In connection with his first firearms offense, the defendant enjoyed significant leniency when he received a time served sentenced that amounted to a two-day term at Rikers Island. (PSR ¶ 81; Def. Sent. Sub. at 4). The defendant's response to this gift of a second chance was *not* to change the trajectory of his life but instead to ramp up his criminal activity. The lesson the defendant learned from his first conviction was that criminal charges and punishment are nothing more than an acceptable cost of doing business. The Court should ensure that the defendant learns a different lesson this time.

The mandatory 60-month sentence in this case is fair and just when comparing the defendant to others in the organization. Two defendants at the top of the defendant's relative culpability group—Enmanuel Liriano and Ray Eduardo—each received 60-month sentences.[8] Like the defendant, those two co-defendants were also street dealers in the Crew—albeit more senior to Santos. However, unlike the defendant, Liriano and Eduardo did not personally possess firearms in connection with the offense. Nor did they have previous firearms convictions. Further, Liriano, who was also on supervised release during the pendency of the case, was compliant with his terms of supervised release, thereby decreasing the apparent need for specific deterrence and promotion of respect for the law. As a relatively junior street dealer, Santos is similar to Christopher Espinal. Espinal, who committed a brutal stabbing in connection with his membership in the Crew, received a 90-month sentence. On balance, the defendant is similarly situated to those co-defendants and the same sentence would be warranted here.

In this case, over 20 members of the Crew are being held accountable for their actions as members of a large-scale drug trafficking organization. Given the number of defendants and the scale of their operation, it is likely that this case is being watched in the community. Those in Washington Heights considering involvement in organizations like the Crew are likely to be aware of the sentences imposed in this case, and will take them into account when deciding whether to

---

[7] As detailed in the PSR, the defendant had persistent non-compliance issues during his time on pre-trial supervised release. Specifically, the defendant more than twenty instances of non-compliance with location monitoring in addition to positive marijuana tests. (PSR ¶ 30).

[8] Judge Abrams recently sentenced Luiyi Santana, another dealer in the Crew to a term of 42 months' imprisonment. In doing so, Judge Abrams noted, correctly, that the length of Santana's involvement in the Crew, a year or less during 2022 and 2023, was significantly shorter than the amount of time that Liriano or Eduardo were involved with the Crew. The scope of the defendant's involvement here was at least three years, on par with that of Eduardo and Liriano.

join an organization like the 174th Street Crew. As to this defendant and all the other defendants in this case, the Court should impose a sentence that sends the right message of deterrence to all those individuals: carrying guns and dealing deadly drugs are not a risk-free enterprises and will lead to a substantial term of imprisonment.

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 60 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

By:   /s/
Ashley C. Nicolas
Andrew W. Jones
Benjamin M. Burkett
Assistant United States Attorneys
(212) 637-2467

cc:   Cesar de Castro, Esq.
Shannon McManus, Esq.